TARA K. MCGRATH
United States Attorney
SABRINA L. FEVE
Assistant U.S. Attorney
California Bar No.: 226590
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-6786
Fax: (619) 546-0831
Email: Sabrina.Feve@usdoj.gov

Attorneys for the United States

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No.: **24MJ1315** |
|---|---|
| Plaintiff, | |
| v. | **COMPLAINT FOR VIOLATION OF:** |
| MARIAN DOGARU, | Title 18, U.S.C., Sec. 1029(a)(2) and (c)(1)(A)(i) - Use of Unauthorized Access Devices; Title 18, United States Code, Sections 1029(a)(2), (b)(2) and (c)(1)(A)(i) - Access Device Conspiracy; Title 18, United States Code, Sections 982(a)(2)(B) and 1029(c)(1)(C) – Criminal Forfeiture |
| Defendant. | |

The undersigned Complainant, being duly sworn, states that, at all times material to the Complaint:

### Introductory Allegations

1. An "access device" was any card, plate, code, account number, electronic serial number, personal identification number, or other means of account access that could be used, alone or in conjunction with another access device, to obtain money,

goods, or services. Common forms of access devices were debit and credit cards, as well as the account information typically encoded on the magnetic strips on the backs of such cards.

2. An "unauthorized access device" was any access device that was lost, stolen, or obtained with intent to defraud.

3. The U.S. Department of Health and Human Services, Administration for Children and Families, administers the Temporary Assistance to Needy Families (TANF) program. TANF is a federally funded assistance program that supports low-income families with children. In California, TANF funds are used to operate CalWORKS, a state public assistance program that provides cash aid to eligible families with one or more children in the home. In California, CalWORKS public assistance benefits are distributed by means of a card encoded with electronic account information, similar to a debit or credit card, called the California Advantage Electronic Benefit Transfer Card, which recipients use, along with a four-digit personal identification number, to withdraw funds.

## Count 1
## Use of Unauthorized Access Devices
## 18 U.S.C. § 1029(a)(2)

4. Paragraphs 1 through 3 are hereby incorporated by reference as if fully stated herein.

5. Beginning on July 3, 2023 through and including April 1, 2024, in the Southern District of California and elsewhere, defendant MARIAN DOGARU did knowingly and with intent to defraud use one and more unauthorized access devices, to wit, Electronic Benefit Transfer account information and personal identification numbers issued to persons other than defendant, during a one-year period, and by such conduct obtain cash and other things of value aggregating $1,000 and more during such one-year period, said use affecting interstate and foreign commerce;

Complaint                                      -2-

All in violation of Title 18, United States Code, Sections 1029(a)(2) and 1029(c)(1)(A)(i).

## Count 2

### Conspiracy to Commit Access Device Fraud

### 18 U.S.C. §§ 1029(a)(2) and (b)(2)

6. Paragraphs 1 through 3 are hereby incorporated by reference as if fully stated herein.

7. Beginning on or before July 3, 2024, through and including March 19, 2024, in the Southern District of California and elsewhere, defendant MARIAN DOGARU did knowingly and with intent to defraud conspire with Catalan Craciun, charged elsewhere, use one and more unauthorized access devices, to wit, Electronic Benefit Transfer account information and personal identification numbers issued to persons other than defendant, during a one-year period, and by such conduct obtain cash and other things of value aggregating $1,000 and more during such one-year period, said use affecting interstate and foreign commerce;

All in violation of Title 18, United States Code, Sections 1029(a)(2), 1029(b)(2), 1029(c)(1)(A)(i).

### Forfeiture Allegations

8. The allegations above are incorporated herein for purposes of alleging forfeiture to the United States pursuant to Title 18, United States Code, Section 982(a)(2)(B) and 1029(c)(1)(C).

9. Upon conviction of the offense set forth in the complaint, defendant MARIAN DOGARU shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(B) and 1029(c)(1)(C), any property constituting and derived from proceeds Defendants obtained directly and

//

Complaint -3-

indirectly from the offense, and any personal property used and intended to be used to commit the offense.

This complaint is based on the attached Statement of Facts incorporated herein by reference.

*Robert McAfee*
Special Agent Robert McAfee
U.S. Secret Service

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on April 2, 2024.

HON. VALERIE E. TORRES
U.S. Magistrate Judge

Complaint

## STATEMENT OF FACTS

I, Robert McAfee, being duly sworn, state as follows:

1. I have been employed as a Special Agent with the United States Secret Service (USSS) since 1999. I am currently assigned to the San Diego Field Office, where I am a member of the Southern California Cyber Fraud Task Force. I am a graduate of both the USSS Training Center in Beltsville, Maryland, and the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia. I also hold a Bachelor of Arts degree in Environmental Sciences from the University of Virginia.

2. The facts and conclusions set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation; my review of documents and records related to this investigation; communications with others who have personal knowledge of the events, details, and circumstances described herein; and information gained through my training, experience, and communications with colleagues. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth every fact that I or others have learned during this investigation. Dates, times, and amounts are approximate.

*Overview*

3. The United States Secret Service (USSS), and the Southern California Cyber Fraud Task Force (SoCal CFTF) are working with state and federal agencies to investigate the theft and misuse of funds electronically distributed to individuals receiving public assistance.

4. This Affidavit is submitted in support of an arrest warrant for Marian DOGARU and a warrant to search a blue Samsung cell phone (Inventory # 412-2024-CE-000076-Item 1) (the **subject device**) for evidence of and relating to access device fraud. As outlined below, between July 3, 2023 and April 1, 2024, DOGARU, often along with his coconspirator Catalin Craciun (charged separately in 24MJ1234-JLB), made a series of unauthorized withdrawals at San Diego County ATMs in which they

accessed and stole, or attempted to steal, from the public assistance benefit accounts of over 200 victims. Agents arrested DOGARU this morning after he was detected making repeated withdrawals from EBT accounts belonging to other people.

*Background on Electronic Benefit Transfer Cards*

5. In 2022, California's Department of Social Services (CalDSS) advised the SoCal CFTF that it had detected a rise in fraud associated with the electronic debit cards issued to individuals and families who qualify for California public benefits like CalFresh and CalWORKS.

6. The U.S. Department of Agriculture also noticed a rise in fraud associated with the Supplemental Nutrition Assistance Program (SNAP) that it administers through its Food and Nutrition Service (FNS). SNAP is a federally funded assistance program designed to help low-income individuals and families purchase food. In California, SNAP public assistance benefits are distributed through CalFresh and loaded to an account that a qualified recipient access by means of an access card, similar to a debit or credit card, called the California Advantage Electronic Benefit Transfer (EBT) Card. The EBT card system was developed to enable government agencies in California and many other states to deliver public assistance benefits to recipients using electronic transfers. The EBT system is a computer-based system through which authorization for qualifying food purchases and cash withdrawals are received via either a point-of-sale (POS) terminal or an ATM.

7. The U.S. Department of Health and Human Services, Administration for Children and Families, administers the Temporary Assistance to Needy Families (TANF) program. TANF is a federally funded assistance program that awards grants to individual states to support low-income families with children. In California, TANF grant funds are used to operate CalWORKS, a state public assistance program that provides cash aid to eligible families with one or more children in the home. Families that apply and qualify for ongoing CalWORKS assistance receive money each month

AFFIDAVIT IN SUPPORT OF COMPLAINT -2-

to help pay for housing, food, and other necessary expenses. Like CalFresh, CalWORKS benefits are distributed by CalDSS through the California Advantage EBT card.

8. After a recipient applies for, and is approved to receive, California public assistance benefits like CalFresh and CalWORKS, the benefits are automatically distributed to the recipient's EBT card on a designated day of the month (typically, in California, the first five days of the month). To access their benefits to purchase eligible food items, recipient swipe their card through a point-of-sale terminal, or insert it into an ATM, that records the card number, date, time, and amount of the transaction. The recipient then enters his/her unique Personal Identification Number (PIN) into a keypad to complete the transaction.

9. The SoCal CFTF has gathered evidence indicating that members of what appear to be one or more criminal enterprises are stealing California EBT account information by installing skimmers on point-of-sale terminals, often by targeting point-of-sale terminals at large volume retailers, like Walmart, in communities with higher concentrations of public benefit recipients. The skimmed data is then often re-encoded onto the magnetic strips of cards that members of the conspiracy use to make unauthorized withdrawals and purchases. These re-encoded cards are sometimes referred to as "cloned" cards. Cloned cards can be a blank white plastic card, or another debit, credit, or gift card. Cloned cards may have names or numbers embossed on the physical face of the card. A common feature of cloned cards is that the account number encoded on the card's magnetic strip will not match the number embossed on the card's face. To facilitate the use of the stolen EBT benefits, members of the scheme will commonly put stickers bearing the account's PIN on the physical cards, or access devices, that are swiped at a point-of-sale terminal along with the account balance.

10. Data provided by CalDSS indicates that, between approximately June 2022 and February 2024, in the Southern District of California and elsewhere,

AFFIDAVIT IN SUPPORT OF COMPLAINT -3-

unauthorized account users have stolen approximately $181,208,693.00 from CalWORKS recipients. These unauthorized withdrawals commonly occur at the start of each month, when monthly CalWORKS benefits are distributed. Most of the stolen funds were obtained through unauthorized ATM withdrawals.

11. In July and August 2022, the SoCal CFTF learned of connected incidents at Walmart stores in Chula Vista, National City, and Sherman Heights involving overlay skimmers that appeared to be part of an EBT fraud scheme.[1] According to police reports and records obtained by the task force, in June 2022, National City Police arrested a Romanian national who was caught installing an overlay skimmer without authorization at a National City Walmart. The suspect had at least one coconspirator assist him with the installation. In July 2022, employees at a Chula Vista Walmart discovered an unauthorized overlay skimmer installed on a point-of-sale terminal. Store surveillance footage showed that the individual arrested by National City Police had, along with his unidentified coconspirator, installed the overlay skimmer at the Chula Vista Walmart two days before his arrest in National City. When arrested by National City Police, the suspect presented a fake European ID that misrepresented his name and nationality. Record checks revealed his true name, Romanian nationality, and indicated that he had entered the U.S. without inspection. Additional investigation revealed that this individual, or someone closely matching his appearance, had installed an overlay

---

[1] An overlay skimmer is a skimmer that is part of a counterfeit faceplate designed to resemble the legitimate point-of-sale terminal. Overlay skimmers are mounted to the legitimate point-of-sale terminal and allow a victim's credit or debit card to be read by the legitimate terminal. In the process of inserting the victim's credit or debit card into the legitimate terminal, the card is also read by the overlay skimmer, which stores the card's stolen electronic information for later unauthorized use. The overlay skimmers that target EBT cards are not designed to read credit or debit cards embedded with a chip (i.e., most credit and debit cards). Unlike most bank-issued credit and debit cards, EBT cards do not have chips (which makes the cards less expensive). The overlay skimmers that cannot read cards with chips therefore typically target EBT cards.

AFFIDAVIT IN SUPPORT OF COMPLAINT -4-

skimmer at a Sherman Heights Walmart in March 2022 with the assistance of two additional coconspirators.

12. In spring 2023, the USSS conducted operations in the Southern and Central Districts of California during which it surveilled ATMs that had historically been used to make unauthorized EBT account withdrawals. During the March operation in Los Angeles, the USSS arrested 14 individuals. During its June 2023 operation, the USSS-San Diego and SoCal CFTF arrested five individuals, along with a sixth individual in July 2023. Five of the six individuals arrested in San Diego County had a history of making of unauthorized EBT account withdrawals in San Diego prior to the night of their arrest and all six had one or more phones on them when arrested. Several of these individuals had also previously installed skimming devices on point-of-sale terminals or inside ATMs, and/or were found in possession of access-device making equipment at the time of their arrest. Of the 20 people arrested in Southern California between March and July 2023, all but one were Romanian. Many of the Romanians arrested possessed fake European IDs.

13. As part of its broader investigation into the theft of EBT account benefits, the SoCal CFTF has obtained warrants to seize and search the phones of individuals engaged in skimming and EBT access device fraud activities. The consistent pattern is that individuals engaged in these activities are using phones in furtherance of the fraud. Examples include using phones to store and transmit stolen EBT account information, using phones to communicate with coconspirators in furtherance of the fraud, using phones to reserve and manage access to short-term rental accommodations and rental vehicles, using phones to navigate and for other location-related searches and services, using phones to conduct balance inquiries on stolen EBT accounts to determine the amount of the benefit and the date it will be deposited, and using phones to record and photograph fraud-related activities.

DOGARU and Craciun's Immigration Arrests on March 19, 2024

AFFIDAVIT IN SUPPORT OF COMPLAINT -5-

14. On March 19, 2024, a uniformed Border Patrol agent assigned to the Newton-Azrak Border Patrol Station in Murrieta, California was patrolling Interstate 15 near Fallbrook, California. Record checks for a gray Ford Explorer (CA 9BSF374) driving near the marked Border Patrol vehicle revealed that the gray Ford Explorer had multiple alerts. According to the alerts, on February 11, 2024, the gray Ford Explorer had driven through the border fence between the United States and Canada, near Lynden, Washington. Investigations indicated that the gray Ford Explorer had transported multiple people from the northern U.S. border to Las Vegas. License plate readers showed that the vehicle frequented the Las Vegas area and then headed west and then south via the Interstate 5. In the agent's training and experience, this travel pattern was more consistent with smuggling activities than normal commuting and travel patterns. Based on this information, as well as the driver's behavior and other factors, the agent initiated a vehicle stop at the Border Patrol Station Checkpoint.

15. At the stop, the agent identified the driver as Marian DOGAU and the passenger as Catalan Craciun based on the Romanian driver's licenses that each man provided. When the agent asked who the vehicle belonged to, the two men looked at each other and shrugged. The agent asked if either of the men owned the vehicle, and Craciun said it belonged to an "Indian man." When the agent asked where the "Indian man" was, they said they did not know. Craciun then dialed a phone number on WhatsApp and handed the phone to the agent. The man on the phone told the agent that the vehicle was his and he had rented it to Craciun, but that man's name was not listed as the vehicle's owner. The grey Ford Explorer was apparently rented through an app, but Craciun denied ever receiving any proof of rental.

16. The agent then asked DOGARU and Craciun if they were in the United States legally. They both said that they flew legally into Las Vegas from Ontario, Canada. The agent then advised both men that there was no record of them flying into the United States and it would be a crime to lie to a federal immigration official.

AFFIDAVIT IN SUPPORT OF COMPLAINT -6-

DOGARU then stated that both men had been smuggled into the United States near New York, after which they were transported to Las Vegas.

17. The agent then arrested DOGARU and Craciun for being in the United States illegally and entering the United States illegally. While searching the vehicle for contraband, the agent found a credit card skimmer under the passenger seat and a fake California driver's license in the driver's door pocket with DOGARU's picture.

18. After being processed at the Border Patrol, Craciun was placed in removal proceedings. On March 27, 2024, agents obtained a warrant and Complaint for Craciun's arrest for violating 18 U.S.C. § 1029 (Case No. 24MJ1234-JLB). Border Patrol released DOGARU to the Riverside County Sheriff's Office for prosecution on skimming-related charges. While in state custody, DOGARU bonded out.

### DOGARU & Craciun's Historical Fraud Activities

19. As part of its broader EBT fraud investigation, the SoCal CFTF collects surveillance images and transaction records for fraudulent EBT withdrawals at San Diego County ATMs. Through the review of these and related records, the SoCal CFTF has documented DOGARU and Craciun's involvement in the following prior fraudulent EBT withdrawals:

    a. On July 3, 2023, not long after midnight, DOGARU and Craciun went to ATMs on Del Mar Heights Road in San Diego. DOGARU attempted to withdraw $6,430.00 from the EBT accounts of eights victims. Craciun attempted to withdraw $1,720.00 from the EBT accounts of six victims. The victims reside in San Diego and Los Angeles Counties. Of the attempted withdrawals, DOGARU successfully withdrew $4,550.00 and Craciun successfully withdrew $1,480.00.

    b. On October 1, 2023, near 2 a.m., DOGARU and Craciun went to different ATMs on Del Mar Heights Road in San Diego. DOGARU withdrew $3,960.00 from the EBT accounts of 15 victims. Craciun initially attempted to withdraw $3,000.00 from the EBT accounts of three victims, and successfully withdrew

-7-

AFFIDAVIT IN SUPPORT OF COMPLAINT

$2,000.000. Four minutes after completing these transactions, Craciun went to a different bank's ATM located nearby and, with an individual who matches DOGARU's appearance standing beside him, attempted to withdraw $16,000.00 from the EBT accounts of 16 victims. Of the attempted withdrawals, Craciun successfully withdrew $15,000.00. DOGARU also changed ATMs and, using the account information of 14 victims, attempted to withdraw an additional $12,400.00, of which he successfully withdrew $7,840.00. The victims reside in San Bernardino, Riverside, and Los Angeles Counties.

      c.     On November 1, 2023, a bit before 2 a.m., DOGARU and Craciun went to ATMs on Valley Center Drive in San Diego. DOGARU attempted to withdraw $1,180.00 from the EBT accounts of three victims and successfully withdrew $540.00. Craciun successfully withdrew $3,040.00 from the EBT accounts of 13 victims. The victims reside in San Bernardino and Los Angeles Counties.

      d.     On November 3, 2023, one night after Craciun made unauthorized EBT withdrawals at a nearby Pacific Beach ATM, DOGARU used an ATM on Garnet Street in San Diego to withdraw $1,180.00 from the EBT accounts of six victims. The victims reside in San Bernardino and Los Angeles Counties.

      e.     On January 3, 2024, near 2 a.m., DOGARU and Craciun again used ATMs on Del Mar Heights Road. DOGARU attempted to withdraw $33,540.00 from the EBT accounts of approximately 34 victims. DOGARU successfully withdrew $27,540.00. Craciun attempted to withdraw $7,460.00 from the EBT accounts of 16 victims and successfully withdrew $4,640.00. The victims reside in San Bernardino and Los Angeles Counties.

      f.     On February 2, 2024, DOGARU and Craciun went to ATMs in Rancho Bernardo. DOGARU attempted to withdraw $29,660.00 from the EBT accounts of 32 victims, of which he successfully withdrew $14,500. Craciun attempted to withdraw $12,760.00 from the EBT accounts of 19 victims, of which he successfully

withdrew $7,660.00. The victims reside in San Diego, Imperial, Los Angeles, Kern, and Orange Counties.

   g. On February 3, 2024, DOGARU again went to a Rancho Bernardo ATM. He attempted to withdraw $27,180.00 from the EBT accounts of 21 victims, of which he successfully withdrew $17,000.00. The victims reside in San Diego and Los Angeles Counties.

   h. On March 2, 2024, DOGARU returned to ATMs in Rancho Bernardo. He attempted to withdraw $40,320.00 from the EBT accounts of 24 victims, of which he successfully withdrew $26,260.00. The victims reside in San Diego and Los Angeles Counties.

   i. Due to their immigration status, neither DOGARU nor Craciun are eligible for CalFresh or CalWORKS. The SoCal CFTF has also collected the names of the victims from whose EBT accounts they made unauthorized withdrawals. None of these victims' names match DOGARU or Craciun's names.

DOGARU's Arrest on April 1, 2024

  20. On the morning of April 1, 2024, the USSS and SoCal CFTF conducted surveillance at ATMs where fraudulent EBT withdrawals had previously occurred. The selected ATMs were all for banks that operate in interstate and foreign commerce and whose headquarters are outside California.

  21. At approximately 6:09 a.m., DOGARU began making withdrawals from a US Bank ATM in Vista, California. According to bank records, over the next 40 minutes, DOGARU successfully withdrew $25,420.00 from multiple EBT accounts, and attempted to make additional unsuccessful withdrawals. Law enforcement received reports from the bank that DOGARU was making multiple EBT withdrawals, along with ATM surveillance images. One of the USSS analysts who received the notice and photographs recognized DOGARU from prior fraud activities. The SoCal CFTF alerted a surveillance team located in Oceanside and provided them with copies of the ATM

AFFIDAVIT IN SUPPORT OF COMPLAINT   -9-

surveillance photos. The Oceanside team redeployed to the Vista ATMs. At the Vista ATM, uniformed law enforcement saw DOGARU approximately 15 feet from the ATM, moving away from the ATM. When DOGARU saw uniformed law enforcement approaching him, he ran back towards the ATM. According to other officers who were on scene, near the ATM, additional law enforcement encountered DOGARU, at which point he stopped running and was placed under arrest.

22. One of the officers standing near the ATM advised me that DOGARU dropped his phone while encountering officers. Law enforcement then recovered a **blue Samsung phone** (the **subject device**) near him. Officers and I also found what appeared to be DOGARU's wallet on the ground near him, which contained his photo ID, along with approximately 25 gift cards on the ground that were later determined to be encoded with EBT account information. During an inventory search, I found $24,140 in DOGARU's back pocket. Law enforcement also found a magnet in DOGARU's possession. In prior cases investigated by the SoCal CFTF, investigators have learned that a small magnet located in a conspirator's wallet will be used to trigger a Bluetooth-enabled skimming device to deliver skimmed data to a phone controlled by the conspiracy. In multiple cases, the SoCal CFTF has also documented the use of a Samsung phone to collect and store skimmed data.

23. I submit there is probable cause to search the phone for evidence of and relating to skimming and EBT fraud-related activity. As outlined in part above, individuals engaged in similar activities in Southern California have been shown to use their phones to communicate with coconspirators, research ATM locations, navigate, store and record fraud-related information (e.g. electronic account information, photos and videos of contraband), conduct balance inquiries via phone and the Internet, and facilitate travel and lodging while conducting fraud-related activities. The investigation to date shows that EBT fraud and related skimming activities involving Los Angeles-area Romanians has occurred in San Diego County since at least March 2022.

AFFIDAVIT IN SUPPORT OF COMPLAINT -10-

Accordingly, this affidavit seeks authorization to search the **subject phone** seized from DOGARU for evidence from July 1, 2023 through and including April 1, 2024.

## Procedures for Electronically-Stored Information

### Cell Phones

24. It is not possible to determine, merely by knowing the cellular phone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

25. Following the issuance of this warrant, the USSS will collect the subject cellular telephone and subject it to analysis. If there are technological challenges, the examiners may need to consult with other law enforcement partners. All forensic

analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

26. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (**90**) days of the date the warrant is signed, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

27. The United States is unaware at this time of other attempts to search the subject devices.

## CONCLUSION

28. Based on the evidence described above, I submit there is probable cause to believe that DOGARU used unauthorized access devices, in the form of victims' EBT account information, between July 3, 2023 and April 1, 2024, and that his use of these access devices resulted in a loss of over $1,000.00, in violation of 18 U.S.C. § 1029(a)(2) (use of unauthorized access devices) and (b)(2) (access device fraud conspiracy. Finally, I submit there is probable cause to search the **subject device** seized from DOGARU for evidence of and relating to access device fraud based on the evidence, opinions, and experience described above.

*Robert McAfee*
_____
Special Agent Robert McAfee
UNITED STATES SECRET SERVICE

AFFIDAVIT IN SUPPORT OF COMPLAINT     -12-